## United States District Court

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

FILED IN OPEN COURT
U.S.D.C. - Atlanta

JUN 0 8 2011

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES OF AMERICA
v.

ROBERTO LOPEZ-MARTINEZ
DOB 11/21/82

**CRIMINAL COMPLAINT**

Case No.: 1-11-MJ-887

I, Stephanie Upton, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about June 8, 2011, in Fulton County, in the Northern District of Georgia, defendant, **ROBERTO LOPEZ-MARTINEZ**, did knowingly and intentionally possess with the intent to distribute a controlled substance, that is, marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D); did knowingly and intentionally possess a firearm during the commission of a drug trafficking offense in violation of Title 18, United States Code, Section 924(c); and unlawfully possessed a firearm being an alien who is illegally and unlawfully in the United States, in violation of Title 18, United States Code, Section 922(g)(1).

I further state that I am a Special Agent with the Drug Enforcement Administration, and that this complaint is based on the following facts:

Please see attached affidavit.

Continued on the attached sheet and made a part hereof.    (x) Yes    ( ) No

_____
Signature of Complainant
SA Stephanie Upton

Based upon this complaint, this Court finds that there is probable cause to believe that an offense(s) has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

June 8, 2011                              at    Atlanta, Georgia
Date                                              City and State

C. CHRISTOPHER HAGY
United States Magistrate Judge                _____
Name and Title of Judicial Officer              Signature of Judicial Officer

AUSA Michael V. Herskowitz

**AFFIDAVIT IN SUPPORT OF COMPLAINT**

I, STEPHANIE UPTON, Special Agent with the Atlanta Field Division Office of the Drug Enforcement Administration (DEA), Department of Justice, being duly sworn, states as follows:

**INTRODUCTION**

1. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United States Code. I have over 9 years as a certified law enforcement officer. I am currently employed as a Special Agent by the Drug Enforcement Administration (DEA) and have been so employed since July 2010. During my employment with the DEA, I have attended several courses pertaining to the investigation of illegal drug sales and trafficking, which includes training on how drug traffickers use cellular telephones to facilitate their trafficking organization's success. Prior to my employment with DEA, I was employed with the Atlanta Police Department from April of 2006 to July of 2010 as a Police Officer. Prior to employment at the Atlanta Police Department I was employed with the Montgomery Police Department from February 2001 to April 2006. Throughout my career I have been assigned to specialized narcotics units, to include Zone 6 Field Investigations Unit, REDDOG, and SWAT, dealing with street level narcotics. I have written and/or executed search, seizure and arrest warrants pertaining to the seizure of all types of criminal evidence; such as: illegal drugs, drug paraphernalia, drug records, drug proceeds and evidence of other types of crimes. I have received

1

specialized training in drug law enforcement, with an emphasis on drug trafficking organizations. I have participated in approximately 250 investigations involving the distribution/possession of drugs and thus have become familiar with the patterns of drug activity.

2. Based on my training and experience, participation in criminal investigations, and the training and experience of other officers and agents with whom I am working closely, I know that:

    a. Drug traffickers maintain on hand large amounts of U.S. currency to maintain and finance their ongoing drug business.

    b. Drug traffickers commonly secret contraband, proceeds of drug sales, and records of drug sales in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, to provide ready access to this material and also to conceal these items from law enforcement authorities.

    c. To accomplish this concealment, drug distributors frequently build "stash" places within their residences or businesses. There are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have in the past been found in the residences of narcotics traffickers.

    d. The sale of controlled substances generates large quantities of U.S. currency in small denominations commonly referred to as "street money"

    e. It is common for drug traffickers to physically handle and count the "street money" after receiving it in exchange for the controlled substances, thereby leaving a trace residue of controlled substances on the "street money." Law enforcement agencies

own dogs which are trained to react to the scent of controlled substances and trace residues of controlled substances; and that those trained dogs have in the past reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers.

    f.    It is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

    g.    Courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions.

    h.    Drug traffickers maintain books, records, notes, ledgers, money orders and other papers relating to the transportation, ordering, sale and distribution of drugs.

    i.    Drug traffickers commonly distribute drugs to their customers and collect the proceeds afterwards and maintain the aforementioned records in locations where they have ready access to them to keep track of their proceeds, amounts owed to them and their drug profits.

    j.    Drug traffickers often use electronic equipment such as computers and facsimile (fax) machines and currency counting machines to generate, transfer, count and/or store the information described above.

k. Drug traffickers commonly maintain records of telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the drug trafficking organization (DTO).

l. Drug traffickers frequently use cellular telephones and keep a list of names and numbers of customers and suppliers in their electronic address books of their cellular telephones. Such cell phones will also carry information in a SIM (Subscriber Identity Module) card, or some other type of electronic storage card, which will reveal the number of the cell phone and other information, leading to the identity of the user.

m. Drug traffickers commonly have in their possession that is on their person, at their residences and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to, narcotics, narcotics paraphernalia, jewelry, books, records, and currency.

n. Distributors of illegal controlled substances usually keep paraphernalia for packaging, cutting, weighing, and distributing illegal controlled substances, including but not limited to marijuana and cocaine. These paraphernalia include, but are not limited to scales, plastic bags, cutting agents, packaging materials, and measuring devices.

3. This affidavit is submitted in support of a complaint for Roberto Lopez MARTINEZ.

4. Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that Roberto LOPEZ- MARTINEZ has committed crimes of Title

4

21, United States Code, Sections 841(a), which prohibits the distribution, possession with intent to distribute, as well as possession of a firearm during the commission of a drug trafficking offense, in violation of Title 18, United States Code, Section 924(c), and possession of a firearm by an alien who is unlawfully in the United States, in violation of Title 18, United States Code, Section 922(g).

## BASIS OF FACTS AND CIRCUMSTANCES PROVIDED IN SUPPORT OF CRIMINAL COMPLAINT

5. This affidavit is based upon my personal knowledge and information that I have developed through participation in this investigation. This affidavit also contains information that I have learned from discussions with Special Agents and Task Force Agents of the Drug Enforcement Administration (DEA); from discussions with other federal, state and local law enforcement officers.

    a. Unless otherwise noted, wherein this affidavit I assert that a statement was made, the information was provided by another law enforcement officer with whom I have spoken or whose report I have read and reviewed. Such statements are not reported in their entirety, unless otherwise indicated. Similarly, information resulting from surveillance, except where otherwise indicated, does not set forth my personal observations, but rather, has been provided to me directly or indirectly through other law enforcement officers who conducted such surveillance.

    b. Because this affidavit is being submitted for the limited purpose of seeking authorization to search locations described herein [*a complaint*], I have not set forth each and every fact learned during the course of the investigation. Facts not set forth herein are not

5

being relied upon in reaching my conclusion that an order should be issued [as to probable cause — CCH], nor do I request that the Court rely upon any facts not set forth herein in reviewing this affidavit.

d. Whenever in this affidavit I state a belief, it is based upon my training and experience, as well as information obtained during this investigation.

## BACKGROUND

6. On May 11, 2011, the following individuals were indicted based on a three year wiretap investigation, conducted by the Drug Enforcement Administration, of a Mexico-based drug trafficking organization which operated cells in the Atlanta, Georgia, area:

a. ADRIAN MARTINEZ-MONTANEZ, a/k/a Alex; ROBERTO PEREZ-MENDOZA, a/k/a Carlos; FRANKLIN ALVARADO-MEJIA, a/k/a Frankie; MARVIN EDLEMAN RODAS-PEREZ, a/k/a Marvin; LUIS ALBERTO HERNANDEZ-MEJIA; JAVIER COLON-HERNANDEZ, a/k/a Cabo; CARLOS MORALES; WILSON TEJADA; JESUS MANUEL SANDOVAL; MARIA MADRIZ-HERNANDEZ, a/k/a Sandra; and SAMANTHA SEPULVEDA MADRIZ, who have been charged in a drug conspiracy beginning on a date unknown to the Grand Jury, but at least by in or about June 2009, and until on or about the date of the Indictment (May 11, 2011);

b. MARIA MADRIZ-HERNANDEZ, a/k/a Sandra; SAMANTHA SEPULVEDA-MADRIZ; RAUL VALENCIA; JOSE VALENCIA, a/k/a Cobo; MARTIN AYALA-CASTENEDA; FAUSTO BUENO-ALVAREZ, a/k/a Gordo; FELIX JOSE VARGAS; CELEDONIO VICTOR ESTRADA, a/k/a Chaparro; JOSE VARGAS, a/k/a Mayate; MANUEL ZUNIGA, a/k/a Bebe; JOSE SANCHEZ-VALENCIA; GEOVANNY MARTINEZ-

SANCHEZ; SONIA SANCHEZ; MARIA DEL ROSARIO, a/k/a Chayo; TOMAR SHAW, a/k/a Jay; DAVID SANCHEZ; JUAN CASTINANDA, a/k/a Brujo; and RUDY VALENCIA, who have been charged in a drug conspiracy beginning on a date unknown to the Grand Jury, but at least by in or about January 2010, and until on or about the date of the Indictment;

    c.    ADRIAN MARTINEZ-MONTANEZ, a/k/a Alex, and FATIMA VASQUEZ, who have been charged in a money laundering conspiracy beginning on a date unknown to the Grand Jury, but at least by in or about September 2009, and until at least by in or about April 2010;

    d.    SONIA SANCHEZ; CARMEN BARBOSA-MENDOZA, a/k/a Maricarmen Mendoza-Cardenes; MARIA DEL ROSARIO, a/k/a Chayo; and DESIREE FRAGOZA, a/k/a Gorda, who have been charged in a money laundering conspiracy beginning on a date unknown to the Grand Jury, but at least by in or about January 2010, and until on or about the date of the Indictment; and

    e.    RAUL VALENCIA; MARIA DEL ROSARIO, a/k/a Chayo; PEDRO PABLO GOMEZ-RIVERO, a/k/a Trucha; MANUEL ZUNIGA, a/k/a Bebe; and MARTIN AYALA-CASTENEDA, who have been charged in a money laundering conspiracy beginning on a date unknown to the Grand Jury, but at least by in or about January 2010, and until on or about the date of the Indictment.[1]

---

[1] Furthermore, many of the above-named defendants are also included in substantive drug and/or money laundering charges.

7.     On June 8, 2011, agents executed arrest and search warrants in this investigation. Agents also conducted numerous knock and talks at locations which had been identified during the investigation based in part on physical surveillance and GPS ping data.

## STATEMENT OF PROBABLE CAUSE

8.     On June 8, 2011, at approximately 7:45 a.m., agents approached the 5668 Wakehurst Drive, Atlanta, Georgia, for the purposes of identifying the occupants of the residence and to attempt to obtain consent to search 5668 Wakehurst Drive, Atlanta, Georgia. Upon arrival at 5668 Wakehurst Drive, agents observed a green Toyota Sequoia Sport Utility Vehicle, bearing Georgia Tag #ETH 2298 and registered to Roberto LOPEZ at 1947 Dunlap Avenue, Atlanta, Georgia. Agents knocked and announced their presence for approximately 10 to 15 minutes with no answer. While in the driveway, Doraville Police Department Officer Josh Ertley walked his narcotic detection canine, Max ,up to the vehicle and received a positive alert for the presence of narcotics odor within the vehicle. Officer Ertley also walked K-9 Max to the rear of the residence, and K-9 Max again alerted positively for the presence of narcotics odor at the rear door, rear window, and an exhaust vent of 5668 Wakehurst Drive.

9.     At approximately 8:05 a.m., Roberto LOPEZ- MARTINEZ opened the front door of the residence and spoke with agents. TFO T.K. Gordon asked LOPEZ why he did not answer the door, and LOPEZ replied that he had been sleeping. TFO Gordon asked LOPEZ if there were any other people within the 5668 Wakehurst Drive, Atlanta, Georgia,, and he replied in the negative. TFO Gordon explained that agents were investigating a

8

complaint about drug activity at 5668 Wakehurst Drive. TFO Gordon then asked LOPEZ if he lived at the residence, and LOPEZ replied that he did, but only lived in a room upstairs and that other individuals unknown to him lived in the other rooms of the house. TFO Gordon asked LOPEZ if he had a key to the residence, and LOPEZ produced the key to the residence from his front jeans pocket. TFO Gordon also detected the odor of raw marijuana and asked LOPEZ about the marijuana smell. LOPEZ also stated that the Toyota Sequioa in the driveway belonged to him and provided TFO Gordon the keys to the vehicle. LOPEZ stated that he had just finished smoking a marijuana joint and showed TFO Gordon a "roach" (a marijuana cigarette).

10.   TFO Gordon then asked for and was granted verbal consent to search the residence and the Toyota Sequoia in the driveway. Agents then entered 5668 Wakehurst to conduct the search. As agents began to conduct a security sweep of the residence, agents observed a large electronic scale in plain view within the living room. Within the garage, agents located two vehicles, a white Chevrolet Astro Van and a Silver Volkswagen Jetta. Because of the size of the mini-van and the fact that the van's windows were "blacked" out, agents opened the rear door of the mini-van as a part of the security sweep and observed several garbage bags containing previously used drug packaging materials.[2] As agents were going upstairs to continue the security sweep, LOPEZ stated that he did not believe that he (LOPEZ) could give consent to search the other rooms in the upstairs. Based upon the fact that LOPEZ was delayed at least 15 minutes before answering the door, agents continued the security sweep for officer safety. While conducting the security

---

[2] Agents did not examine the contents of the garbage bags in the rear of the mini-van. However, based upon the smell, agents believe that the bags contain marijuana packaging.

9

sweep upstairs, agents observed a green bale of suspected marijuana in one of the upstairs bedroom. Agents also observed a magazine for a semi-automatic rifle in the upstairs hallway closet in plain view.

11.     As agents continued the security sweep, LOPEZ stated to TFO Gordon that he was not in the United States legally. Also, he said there was also a pistol in his (LOPEZ's) room. Agents located an unloaded Taurus .38 revolver located in the master bedroom and several rounds of ammunition next to the pistol. After finishing the security sweep for additional occupants, agents stopped searching and obtained a search warrant for 5668 Wakehurst Drive.

12.     During the execution of the search warrant at 5668 Wakehurst Drive, agents located, in part, a large amount of U.S. Currency, amount unknown; a money counter; a large amount of unused drug packaging materials; an electronic scale, 4 large trash bags which had been used to hold marijuana; a drug ledger; and approximately 70 pounds of marijuana.

Based on the above and foregoing, there is probable cause to believe that Roberto LOPEZ- MARTINEZ has committed crimes of Title 21, United States Code, Sections 841(a), which prohibits the distribution, possession with intent to distribute, as well as possession of a firearm during the commission of a drug trafficking offense, in violation of Title 18, United States Code, Section 924(c), and possession of a firearm by an alien who is unlawfully in the United States, in violation of Title 18, United States Code, Section 922(g).